THE STATE OF OHIO, APPELLEE, *v.* MORRIS, APPELLANT.
THE STATE OF OHIO, APPELLEE, *v.* MCSPADDEN, APPELLANT.

[Cite as State v. Morris (1975), 42 Ohio St. 2d 307.]

(Nos. 74-81 and 74-94—Decided May 21, 1975.)

*Mr. Harry Friberg,* prosecuting attorney, *Mr. Melvin L. Resnick* and *Mr. Charles J. Doneghy,* for appellee.

*Hayward, Cooper, Straub, Walinski, Cramer & Co., L. P. A., Mr. Richard S. Walinski* and *Mr. John L. Straub,* for appellant Morris.

*Mr. John D. O'Connell* and *Mr. Roy Daniel Chinnis,* for appellant McSpadden.

CORRIGAN, J. In case Nos. 74-81 and 74-94, appellants Morris and McSpadden, respectively, cite as error the admission in evidence at trial of certain narcotics which, they allege, were obtained in violation of the restrictions of the Fourth Amendment to the United States Constitution, prohibiting unreasonable searches and seizures.

In case No. 74-81, appellant Morris also maintains that the verdicts returned by the jury in the trial of the codefendants on the first count of the indictment are inconsistent and repugnant and must be set aside. Appellant Morris also contends that the procedure whereby the grand jury returns secret indictments constitutes a denial of due process and equal protection of the law; and that Ohio law compels, at the least, a preliminary examination be held or that the accused be provided a copy of the grand jury minutes.

In case No. 74-94, appellant McSpadden maintains that the trial court committed reversible error in denying the defense the opportunity to present new evidence directly related to the veracity of the testimony of the state's toxicology expert witness, in violation of appellant's Sixth Amendment right to confrontation; that the discovery of other new evidence subsequent to the appellate court's decision is directly related to due-process and fair-trial standards of the Fifth and Sixth Amendments to the United States Constitution and mandates reversal of appellant's conviction on the first count of the indictment.

For purposes of this opinion, the appeals in case Nos. 74-81 and 74-94 will be treated jointly on the issues touching the legality of the search and seizure conducted at the Toledo Penn Central Railroad Terminal. The other propositions urged by appellants will be discussed separately as they relate to each case.

## I.

Preliminary to a discussion of the legality of the search, is the question of appellants' standing to challenge the search, first raised by the prosecution on appeal.

It is well established that: "It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. * * *" (Paragraph three of the syllabus in *State* v. *Childs* [1968], 14 Ohio St. 2d 56.)

It is not necessary for this court to consider whether the "automatic standing" provisions of *Jones* v. *United States* (1960), 362 U. S. 257, have been overruled by *Simmons* v. *United States* (1968), 390 U. S. 377.

Clearly, the defendants were entitled, under *Simmons*, to testify in support of their motion to suppress and the testimony could not thereafter be admitted against them in the trial. In the present case, however, no record was made on the "standing" issue upon which this court could base its review.

Moreover, not only did the prosecution compound the error in failing to object to the appellants' standing to contest the introduction of the evidence obtained in the search, but also in proceeding under the assumption that appellants did, in fact, have standing and in choosing instead to defend the reasonableness of the search.

Had appellants failed to object to the introduction of the evidence obtained in the search prior to trial, their right to object would have been waived. *State* v. *Davis* (1964), 1 Ohio St. 2d 28. Where, as here, the state fails to challenge appellants' standing to object and thereby preserve its record for appeal and instead elects to defend the reasonableness of the search and seizure, it also waives any right to challenge "standing" on appeal. *State* v. *Childs, supra* (14 Ohio St. 2d 56). See, also, *United States* v. *Moody* (C. A. 3, 1973), 485 F. 2d 531, 533, fn. 3, where the court likewise refused to determine, upon appeal, an appellant's standing to challenge an alleged illegal search

and seizure because: (1) Appellant's reliance on "automatic standing" under *Jones* v. *United States, supra* (362 U. S. 257), was reasonable; (2) the issue was not raised by the government until the appeal, and the trial court had no opportunity to examine the question, and (3) the Third Circuit Court of Appeals held for the government on the merits and a decision on the question would have no practical effect on the outcome.

## II.

Appellants in case Nos. 74-81 and 74-94 contend that the warrantless search of the suitcase checked in the parcel and baggage room of the Penn Central Railroad Terminal violated their Fourth Amendment right to protection from unreasonable governmental searches and seizures.

Appellants maintain that the search, conducted by the Penn Central baggage agent, Penn Central security officer and Toledo police officers, was not a private search but was tainted by police participation, since the police officers unlocked the suitcase and later examined the evidence therein without a search warrant and without probable cause to search or exigent circumstances justifying a warrantless search. Since a determination as to the constitutional validity of the search in this case requires an examination of the facts surrounding the search, a review of the testimony taken at the suppression hearing and at trial is necessary.

The suitcase in question was checked in at the baggage room of the Penn Central Railroad Terminal in Toledo, Ohio, at approximately 11:13 a. m. on October 20, 1971. The baggage agent then on duty, Milton E. Julert, testified that a man, he later identified as Joaquin Ramos, brought in the suitcase and sought to deposit it at the baggage room. Julert suggested that the suitcase be placed in a coin locker on the main concourse of the terminal where it would be safer. The man insisted, however, that it be checked in the baggage room. He stated that he would leave it for a day or two.

Julert thought that the circumstances under which the bag was deposited were unusual and gave him cause for concern. The baggage room was ordinarily used as a temporary depository for baggage received from incoming trains or to be placed on outgoing trains. The suitcase in question was the first item parcel-checked in the baggage room in six months. In Julert's opinion, the man who left the suitcase seemed "tense and nervous," as if anxious to leave the baggage area, and became hostile when it was suggested that he place the bag in a coin locker: Subsequently, on lifting the bag in order to move it, Julert testified that it felt unusually heavy. Upon rocking it back and forth, he observed that the contents made a "rustling" sound like cellophane or plastic would make. Julert testified that the thought passed through his mind that there may have been a bomb in the suitcase but he dismissed the idea and his primary concern was for protection of the checked suitcase. He stated, however, that he was constantly aware of the bag's presence and concerned about it. Julert, since he was scheduled to be off duty for the next two days, notified Charles W. Sibold, the relief baggage agent, that a suitcase had been checked that day, October 20, 1971, and that an additional 50-cent charge would be levied the following day. On Saturday, October 23, Sibold noticed that the suitcase was still there and was aware that it was expected to remain there only a day or two. Sibold then proceeded to make an examination of the bag, noting the bag's weight and the "swishing" sound it produced.

On Tuesday, October 26, Sibold, observing that the bag had not yet been picked up, asked Julert why he had not contacted the Penn Central Police Department regarding the bag and the manner in which it had been checked. According to Sibold's testimony, Julert responded that he intended to. When, on the following day, October 27, Sibold saw that the bag was still there, he spoke with Captain Albert Blevins of the Penn Central police, relating the circumstances regarding the checking of the bag, the length of time it had been left, its weight, and the unusual sound

emanating from within, and expressing a desire to open the suitcase. Sibold stated that his reasons for wanting the bag opened were based upon the excessive weight, sound, and circumstances under which it was checked, which led him to worry that the bag might contain explosives or a bomb and should be opened for the protection of the company. Both men then proceeded to attempt to find keys with which the bag might be opened. The keys which the men tried in the lock failed to open it. Blevins told Sibold that he would try to get assistance in unlocking the bag and that afternoon called Detective George Ryan, a personal friend, and his primary contact with the Toledo Police Department. Blevins stated that he was concerned about the contents of the bag after he had made an examination of its exterior similar to that of Julert and Sibold. He thought there might be a bomb in it but felt that handling the bag was not likely to explode it. Blevins and Sibold also stated that the presence of a Penn Central security officer at the opening of unclaimed or suspicious luggage was usually sought in order to witness the opening and thereby protect Penn Central personnel from accusations of theft or damage to the contents occurring during such openings. Blevins then stated that, when he called Detective Ryan, he asked merely for advice as to how to unlock a locked suitcase. Both Blevins and Sibold felt that the baggage man had the right to open suspicious baggage for protection of the company even though, as a matter of company policy, bags unclaimed for 30 days were usually sent to the company office in Detroit.

On Thursday, October 28, Detective Ryan accompanied by Officer Harry Bedal, of the Toledo Police Armory who had experience in opening locks, were en route to the Toledo Penn Central Terminal when they met Detective Robert Beavers. Beavers, who was, at that time, assigned to the Metropolitan Drug Unit along with Detective Ryan, was invited to join them. Arriving at the baggage room, Officer Bedal, in the presence of Sibold, Blevins, Ryan, and Beavers, proceeded to unlock the bag's latches successfully with the aid of two paper clips. Sibold then opened the

latches on each end and spread the suitcase open. The record is not clear as to who directed Sibold to open the case, but Sibold does state, at one point, "And then I was told that it was Penn Central property, to open it up." After it had been opened, the assembled group observed a number of cellophane bags containing white powder and some towels. Detective Beavers picked up a bag with the initial "C" on it, opened and examined it, showing it to Detective Ryan. The officers had reason to believe the bag contained narcotics and requested a field test kit from the Metropolitan Drug Unit.

The officers' field test indicated a positive result for cocaine from the bag marked "C," and the officers took the bags to a laboratory for further examination. The laboratory examination established that the bags contained the narcotics heroin and cocaine.

On October 31, 1971, a surveillance of the Penn Central Terminal by Toledo police resulted in the observation of the appellants and codefendant Willie Middlebrook driving up to the terminal. Codefendant Middlebrook entered the terminal and presented the claim check for the bag at the baggage room desk and obtained the suitcase. Appellant Morris entered the terminal and met Middlebrook on the main concourse level where Middlebrook attempted to hand the bag to Morris. At this time, Morris and Middlebrook were arrested by Toledo police officers who had been observing them. Subsequently, appellant McSpadden who had been sitting in the back seat of the car in which the three had arrived was also arrested.

The suitcase contained 11 bags of heroin and one bag of cocaine. Measured in kilograms, the contraband weighed 5.35 kilos of heroin and .94 kilos of cocaine. So, the record reflects that the police officers did not happen onto a furtive, alley operation of a couple of shadowy pushers of spoons of drugs but conspicuously, indeed inescapably, a clandestine team operation involving the upper echelons of organized crime. In answer to a question from the court during oral argument, counsel for a defendant stated that the contraband seized had a variously estimated value of

from two million dollars to ten million dollars. In either event, the administration of criminal justice must be equal, even-handed, fair and firm, without respect to persons.

Appellants maintain that these facts establish that the search in question was conducted by private parties acting at the direction of and as agents of the Toledo police and that the search and seizure by police officers or their agents does not meet the requirements of any of the recognized exceptions to the warrant requirement and is, therefore, an unreasonable search and seizure prohibited by the Fourth Amendment to the United States Constitution. We disagree.

In *Burdeau* v. *McDowell* (1921), 256 U. S. 465, the United States Supreme Court set down the rule of law that the Fourth Amendment protection against unlawful searches and seizures applies only to action by government authorities or their agents. See, also, *Byars* v. *United States* (1927), 273 U. S. 28; *Lustig* v. *United States* (1949), 338 U. S. 74.

The unlawful acts of private individuals in conducting illegal searches and seizures are not subject to constitutional proscription. Where, however, a warrantless search is not an exclusively private undertaking but involves some degree of police participation, then courts must look to the facts surrounding the search in order to determine whether it is an unreasonable police search or an excepted private search.

The United States Supreme Court, in *Byars* v. *United States* and *Lustig* v. *United States, supra,* set out standards for determining whether or not federal government participation in illegal state searches was sufficient to render the evidence secured by state authorities inadmissible in federal prosecutions. Those decisions, beginning with *Byars,* dealt with federal participation in illegal state searches and the extent of participation necessary to invoke the exclusionary rule established in *Weeks* v. *United States* (1914), 232 U. S. 383. *Lustig, supra,* crystallized the participation doctrine into the "silver platter" doctrine.

The court, in *Lustig*, stated, at page 78, that a search is a functional process and that "* * * a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the * * * [participation doctrine] is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. * * *" Despite the broad statement by the court as to what constituted federal participation for purposes of the exclusionary rule, the facts, in *Lustig*, indicated participation by federal authorities beyond mere observance of evidence and examination for purposes of prosecution.

The sweeping prohibition against any federal participation in illegal state searches laid down in *Lustig* may also be ascribed to the opinion of some members of the court that no rational distinction existed between state searches and federal searches for purposes of application of the exclusionary rule which would justify the "silver platter" doctrine. It is important to note that the court subsequently overruled the "silver platter" doctrine and extended the constitutional protection against unreasonable searches and seizures to those conducted by state agents. *Elkins* v. *United States* (1960), 364 U. S. 206.

The theory formulated for the problem of federal participation in state searches is analogous to the problem in the present case and some of the standards are useful.

In this vein, we note the Supreme Court's decision in *Byars, supra* (273 U. S. 28), wherein it is stated, at page 32:

"While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods. * * *"

This seems to us a better test for examining cases

involving private or police-search controversies, especially in view of the facts in the present case.

Similarly, a number of federal courts, dealing with the question of police participation in private searches, have based their decisions on the circumstances attending the searches. In *United States* v. *Cangiano* (C. A. 2, 1972), 464 F. 2d 320, vacated on other grounds (1973), 413 U. S. 913, affirmed (C. A. 2, 1973), 491 F. 2d 905, certiorari denied,      U. S.    , 41 L. Ed. 2d 1171, the court relied on the fact that the government did not instigate the search, and, in *Haerr* v. *United States* (C. A. 5, 1957), 240 F. 2d 533, 535, the court determined that police participation in stopping an automobile was not primarily for the purpose of the discovery of contraband or evidence of guilt to be used in the prosecution of a criminal action.

In those cases, and in numerous others, courts have held illegal searches to be the actions of private individuals even though there was some police involvement in several. More importantly, the preceding cases involved other issues related to the police participation question, such as the right of carriers to inspect goods under tariff regulations and the right to inspect abandoned goods. The police participation question is frequently interrelated with other warrantless search exceptions, for example, consent searches, airline security searches, custodial searches and searches justified by exigent circumstances. *United States* v. *DeBerry* (C. A. 2, 1973), 487 F. 2d 448; *United States* v. *Valen* (C. A. 3, 1973), 479 F. 2d 467; *United States* v. *Wilkerson* (C. A. 8, 1973), 478 F. 2d 813; *United States* v. *Echols* (C. A. 8, 1973), 477 F. 2d 37, certiorari denied, 414 U. S. 825; *United States* v. *Burton* (C. A. 8, 1973), 475 F. 2d 469; *United States* v. *Lawless* (C. A. 4, 1972), 465 F. 2d 422; *Gold* v. *United States* (C. A. 9, 1967), 378 F. 2d 588; *United States* v. *Pryba* (D. C. D. C. 1970), 312 F. Supp. 466; *United States* v. *Blum* (C. A 2, 1964), 329 F. 2d  49, certiorari denied, 377 U. S. 993; *People* v. *McKinnon* (1972), 7 Cal. 3d 899, 500 P. 2d 1097, certiorari denied, 411 U. S. 931.

In those cases, as well as those previously cited, courts have not limited their decisions to any single exception to the warrant requirement, but have examined all the circumstances surrounding the search with an eye to detect and prevent "circuitous and indirect violations of the Constitution" in order to determine its reasonableness in each situation. *Byars* v. *United States, supra* (273 U. S. 28).

This standard was applied by the Court of Appeals in *Corngold* v. *United States* (C. A. 9, 1966), 367 F. 2d 1, relied upon by appellants. In that case, however, the court's review of all the circumstances surrounding the search by the airline agents showed the search to have been instigated by federal custom agents, conducted solely at their insistence for no purpose of the carrier. Moreover, the packages in question were actively opened by the federal agents. Probable cause for suspecting the packages contained contraband watches had been obtained by means of an exterior search of defendant's apartment with a scintillator prior to any action by the airline baggage agents. The court based its decision that the search was a police search upon the circumstances attendant to it. The majority opinion's suggestion that the search would be a police search even if TWA had instigated it because of the active participation of federal agents in rummaging through the packages can only be regarded as *dictum*. Such a suggestion also appeared in *Lustig, supra* (338 U. S. 74), although the majority decision rested upon more convincing evidence of police participation.

The record in the present case indicates that the search was instigated solely by the Penn Central baggage agent, Sibold, for Penn Central purposes, *i. e.*, the protection of the baggage, facilities and patrons of the terminal. While the Penn Central baggage agents had no apparent contractual right to open baggage prior to the expiration of a 30-day period in which it remained unclaimed, they did, however, have a right and concomitant duty to protect Penn Central property and the property of passengers and

bailees against destruction. Quite clearly, they also had the duty to provide for the physical safety of everyone on Penn Central property.[1]

Had it not been for the difficulty in unlocking the suitcase, the inspection might have remained an exclusively private undertaking.

The Toledo police were called upon, however, to unlock the suitcase. The record is void of any evidence that the police had prior knowledge of the existence of contraband and their "intrusion" into the suitcase was not "* * * with the specific intent of discovering evidence of a crime * * *." *Cady* v. *Dombrowski* (1973), 413 U. S. 433, 442, fn.

In *Cady*, the facts showed that an off-duty Chicago policeman had been involved in an automobile accident. The rented automobile which the officer had been driving was damaged in the accident, and, at the direction of investi-

---

[1]Patrons of railroad facilities and their guests are business invitees for purposes of the liability in tort of owners and occupiers of land to those injured on their premises. See, for example, *McCann* v. *Anchor Line* (C. A. 2, 1935), 79 F. 2d 338.

Under the common-law rule, first announced in the English case, *Indermaur* v. *Dames* (1866), L. R., 1 C. P. 274, affirmed L. R., 2 C. P. 311, an owner and occupier of premises has a duty to protect business invitees, not only against dangers of which he knows, but also against those which with reasonable care he might discover. The degree of care to be exercised is that commensurate with the danger involved. *Foy* v. *Friedman* (1960), 280 F. 2d 724; *Thompson* v. *Ohio Fuel Gas Co.* (1967), 9 Ohio St. 2d 116; *Tom* v. *Days of '47, Inc.* (1965), 16 Utah 2d 386, 401 P. 2d 946; *Meredith* v. *Reed* (1866), 26 Ind. 334.

A carrier, for example, may be required to protect its passengers from third persons who have threatened them with violence. *Bullock* v. *Tamiami Trail Tours* (C. A. 5, 1959), 266 F. 2d 326.

In the present case, regardless of the duties of the railroad in respect to their liability for damage to property as a bailee or carrier, there clearly exists a duty to protect the passengers, guests and employees of the railroad from physical harm, especially where, as here, they have some reason to believe a package may be harmful. A corresponding right must also exist to inspect packages which the railroad has reason to believe may be harmful. The right to ascertain the existence of danger and to prevent injury must exist if the railroad is to avoid liability for negligence in those cases where dangerous substances are suspected.

gating Wisconsin police officers, it was towed to a privately owned garage. Subsequently, the driver was arrested for drunken driving, and, because of his injuries sustained in the accident, the officers took him to a hospital. The driver was later hospitalized for observation, when, for unexplained reasons, he lapsed into a coma. One of the officers, believing that Chicago police officers were required to carry service revolvers at all times, and, not observing one in the possession of the defendant, drove to the garage to find the revolver. While searching the interior and trunk of defendant's rented auto for the revolver, the officer discovered a number of bloodstained objects which were later introduced in the defendant's trial for murder, resulting in a conviction. In upholding the warrantless custodial search of the automobile, the Supreme Court of the United States stated, among other things, that the intrusion into defendant's trunk was not for the purpose of gathering evidence to be used in a criminal prosecution, but was to protect the general public from the possible removal of a revolver by a vandal who might endanger the public safety. Since the officer reasonably believed that the trunk might contain a revolver, the search was in the nature of a custodial or caretaking duty and, the court felt, not unreasonable in light of the facts and circumstances surrounding it. The rationale underlying this decision is particularly applicable to the present case.

Certainly, it would be naive to assume that, here, the police officers would have been uninterested in evidence of a crime if it were presented to them, but they were not required to have a search warrant for the assistance which they supplied. Their actions were limited to unlocking the bag, after which a Penn Central employee opened it. Then, and only then, the police officers examined the contraband in plain view therein. This action amounted to what has been described as a community caretaking function. *Cady, supra,* at 441. What police participation did occur in examining and seizing the contents of the bag is justified under the so-called "plain view" exception to the warrant requirement. *Harris* v. *United States* (1968), 390 U. S.

234; *Coolidge* v. *New Hampshire* (1971), 403 U. S. 443; *Cady* v. *Dombrowski, supra.*

This court is of the opinion that the search in question was a private search and that Toledo police officers had every right to be present at the unlocking and opening of the bag in pursuance of their duty to safeguard the safety of the community from the threat of harm. We do not hold, herein, that the threat of harm to the community in all cases justifies police action in derogation of the provisions of the Constitution, but, where all the facts and circumstances surrounding a search demonstrate that it is an essentially private undertaking involving minimal police participation in the pursuance of a legitimate community function and without intent to evade constitutional protections, we cannot say the search is unreasonable and in violation of the Fourth Amendment to the United States Constitution.

This result, and the rationale behind it, are consistent with recent federal decisions, and in agreement with the *dicta* expressed in the federal decisions dealing with this same search. *United States* v. *Capra, supra* (372 F. Supp. 600, 603, 609),[2] affirmed, *United States* v. *Capra, supra* (501 F. 2d 267).[3]

---

[2]*United States* v. *Capra* (1973), 372 F. Supp. 603, at 608, reads:

"While the railroad employees did not have or seek legal advice, their conduct was at least consonant with their employer's duties and rights—whether as a non-gratuitous bailee * * * to protect its own property, the property of passengers, and the physical safety of everyone against even modest, if not chimerical, dangers of explosions or other kinds of destruction.

"When the Toledo police officers arrived in this setting, the occasion for their presence was primarily service to those who had enlisted their aid rather than the pursuit or detection of criminals. Undoubtedly, they were prepared to be interested in evidence of criminal misconduct. But they were not required to have a search warrant for the precautionary assistance they came to supply. * * *

"In short, the court would sustain this as an essentially private search and a lawful seizure under authorities not always perfectly harmonious but sufficient in their net effect to validate what was done here. * * *"

[3]*United States* v. *Capra* (1974), 501 F. 2d 267, 272, fn. 4, reads:

## III.

Justice Benjamin F. Cardozo, when he was a judge on the Court of Appeals of New York, wrote an often quoted statement in his opinion in the case of *People* v. *Defore* (1926), 242 N. Y. 13, 21, in commenting on the federal rule at that time (January 1926), which later became binding on the states, that evidence of criminality wrongfully seized in a trespass by agents of the federal government should be rejected as incompetent and returned to the defendant on a motion to suppress, and "The criminal is to go free because the constable has blundered."

The minority opinion herein and its assenters seem to approve the mistaken altruism of the society of questers for constables' blunders as apologia for outlawry.

The solicitude for the observance of the mandates of the Fourth Amendment regarding searches and seizures is admirable. But when they reach the facts I am uncertain that we are reading from the same record.

---

"Assuming arguendo that the defendants did have standing, this court is in agreement with the trial court's alternative holding, that this was a private search, and not subject to the Fourth Amendment. *Burdeau* v. *McDowell*, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). The government did not instigate this search, *United States* v. *Cangiano*, 464 F. 2d 320 (2 Cir. 1972), vacated on other grounds, 413 U. S. 913, 93 S. Ct. 3047, 37 L. Ed. 2d 1023 (1973), aff'd 491 F. 2d 905 (2 Cir. 1973), cert. denied,      U. S.      , 94 S. Ct. 3223, 41 L. Ed. 2d 1171; rather, it was motivated by a genuine concern on the part of railroad personnel for the safety of railroad property, fellow employees, and themselves. See *United States* v. *DeBerry*, 487 F. 2d 448 (2 Cir. 1973). This concern was understandably engendered by the unusual baggage check, Ramos' nervous behavior, the weight of the suitcase, the delay in claiming it, and prior exposure, through media and personal experience, to bomb scares. Police participation was not so pervasive that the opening of the suitcase was primarily for 'the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action.' *Haerr* v. *United States*, 240 F. 2d 533, 535 (5 Cir. 1957). And when police are merely assisting a private party, who has authority to search and a legitimate need to do so, see *United States* v. *Antonelli*, 434 F. 2d 335 (2 Cir. 1970), courts are reluctant to exclude resulting evidence. *Wolf Low* v. *United States*, 391 F. 2d 61 (9 Cir.), cert. den. 393 U. S. 849, 89 S. Ct. 136, 21 L. Ed. 2d 119 (1968). See generally *United States* v. *Blum*, 329 F. 2d 49 (2 Cir.), cert. den. 377 U. S. 993, 84 S. Ct. 1920, 12 L. Ed. 2d 1045 (1964)."

324

They say, for example:

"* * * The police did not arrive to open the suitcase until the day after they were called * * *."

The record demonstrates that the police unlocked the locks on the suitcase but did not open it.

They assert:

"By the majority's decision, it is difficult to avoid the conclusion that the police are now at liberty to open anyone's baggage upon the request of any private citizen * * *."

Again, the record demonstrates that the Toledo police did not open the baggage.

Finally, the dissent presciently premises:

"* * * it is absurd to argue in this situation that the discovery of the contents of the suitcase was in any way inadvertant [*sic*], since their discovery was precisely the purpose for breaking into the suitcase."

For the last time, the Toledo police not only did not break into the suitcase, they did not even open it.

In the United States Supreme Court case of *Boyd* v. *United States* (1886), 116 U. S. 616, there is a memorable observation by Mr. Justice Bradley concerning the duty of courts to be watchful for the constitutional rights of the citizen and against any stealthy encroachments thereon. He says that such infringements should be resisted in the beginnings. He employs the Latin, *obsta principiis,* and suggests that such early opposition be the motto of the courts. With equal solicitude the courts should resist at the beginnings encroachments on the rights of citizens to enjoy domestic tranquility free from the vicious outlawry of purveyors of hard drugs. This suitcase of heroin and cocaine being delivered from the importer to the wholesaler at Toledo marked the beginnings of the paths of distribution by pushers and peddlers of these ruinous contrabands, devastating lives of children, adolescents and adults, and wrecking careers, families and homes by catering to and encouraging human frailty and weakness. By the fortuitous circumstances of a private search of the suitcase,

a program of cruel, ruthless, inhuman criminality was arrested. And the criminals apprehended should not go free here, because the constable did not blunder.

*IV.*

In case No. 74-81, appellant Morris maintains that the verdicts returned by the jury in the trial of the codefendants on the first count of the indictment are inconsistent and repugnant. Appellant bases this proposition of law upon both the fact that the jury returned a not guilty verdict for codefendant Middlebrook on the first count of the indictment charging conspiracy while returning guilty verdicts against the appellants; and the fact that the jury returned a verdict of guilty of possession of narcotics for sale against appellant Morris, while finding appellant Mc-Spadden and codefendant Middlebrook guilty only of possession of a narcotic.

An examination of the record discloses nothing inconsistent or repugnant in relation to the jury verdicts rendered as to each of the codefendants on the separate counts of the indictment.

There is evidence that codefendant Middlebrook was merely a dupe in the conspiracy to violate the narcotics laws. Similarly, there is evidence of appellant Morris' intent to sell the narcotics which is inapplicable to the other defendants. There is, additionally, no requirement that judgments on the same count of an indictment in a criminal case be consistent as to codefendants. *State* v. *Hirsch* (1956), 101 Ohio App. 425; *Cleveland* v. *Ryan* (1958), 106 Ohio App. 110.

Appellant Morris contends further that the grand jury procedure whereby secret indictments are returned constitutes a denial of due process and equal protection of the law, and that Ohio law compels, at the least, a preliminary examination be held or that the accused be provided a copy of the grand jury minutes.

In paragraph one of the syllabus in *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, this court stated:

"The only purpose of a preliminary hearing is to de-

termine whether sufficient facts exist to warrant the court in binding the accused over to the grand jury and to set bail, and once an indictment has been returned by the grand jury, a preliminary hearing before a magistrate is no longer necessary. (Paragraph one of the syllabus of *State* v. *Minamyer,* 12 Ohio St. 2d 67; *State* v. *Wilkinson,* 17 Ohio St. 2d 9; *White* v. *Maxwell,* 174 Ohio St. 186; and *Crider* v. *Maxwell,* 174 Ohio St. 190, approved and followed.)''

Likewise, in *State, ex rel. Haynes,* v. *Powers* (1969), 20 Ohio St. 2d 46, 48, this court again reaffirmed its determination that there is no constitutional right to a preliminary hearing, and that, when an indictment is returned by a grand jury, a hearing is no longer required under R. C. 2937.10. See, also, *State* v. *McClellan* (1966), 6 Ohio App. 2d 155, 158, certiorari denied, 386 U. S. 1022.

Appellant Morris also failed to show a particularized need for inspection of the minutes of the grand jury and is not entitled to that relief. *State* v. *Laskey* (1970), 21 Ohio St. 2d 187; *State* v. *Rhoads* (1910), 81 Ohio St. 397.

### V.

In case No. 74-94, appellant McSpadden maintains that the trial court committed reversible error in denying the defense the opportunity to present new evidence directly related to the veracity of the state's toxicology expert witness, in violation of appellant's Sixth Amendment rights. Appellant also urges that newly discovered evidence, subsequent to the decision of the Court of Appeals and directly related to the due-process and fair-trial standards of the Fifth and Sixth Amendments to the Constitution of the United States, precludes appellant's conviction for conspiracy on the first count of the indictment and mandates reversal of the conviction.

Both propositions of law lay claim to error in the denial of appellant's motion for new trial on the basis of newly discovered evidence. It is well established in Ohio that, where a notice of appeal is directed to an adverse judgment and to the order of the trial court overruling appellant's motion for new trial, a bill of exceptions must be filed with the appellate court in order to bring upon the

record the evidence presented by affidavit or otherwise at the hearing on the issue. *Keating* v. *Spira* (1948), 52 Ohio Law Abs. 319, 82 N. E. 2d 553; *E. W. Bohren, Inc.,* v. *Dangler* (1954), 97 Ohio App. 217; *Richlin* v. *Gooding Amusement Co.* (1960), 113 Ohio App. 99, dismissed for want of debatable constitutional question, 172 Ohio St. 342. See, generally, 3 Ohio Jurisprudence 2d 338, Appellate Review, Section 428.

In the absence of a bill of exceptions relating to these issues, this court cannot at this time review the actions of the trial court in denying appellant's motions.

For the foregoing reasons, the judgments of the Court of Appeals in case Nos. 74-81 and 74-94 are affirmed.

*Judgments affirmed.*

HERBERT, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.

O'NEILL, C. J., and STERN, J., dissent.

STERN, J., dissenting. The mandate of the Fourth Amendment is that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." In order to ensure that security, the Amendment provides that searches and seizures be upon warrant and probable cause. Where a search is made without a warrant, it is *per se* unreasonable except for a few familiar exceptions. *Coolidge* v. *New Hampshire* (1971), 403 U. S. 443; *Katz* v. *United States* (1947), 389 U. S. 347. On the facts of this case, I can find no basis for finding that the warrantless search and seizure herein comes within any of these exceptions, and I accordingly dissent.

Searches conducted outside the judicial process, without the prior approval of a judge or magistrate, are *per se* unreasonable under the Fourth Amendment, for to grant the police authority to decide whether there is adequate evidence to justify their search without a warrant "would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." *John-*

*son* v. *United States* (1948), 333 U. S. 10, 14. A search without warrant may be reasonable where "the exigencies of the situation made that course imperative" (*McDonald* v. *United States* [1948], 335 U. S. 451, 456), if the police activity is predicated not only upon probable cause, but also upon a need for immediate action to prevent personal injuries, escape of persons accused of committing a crime, or destruction, removal or concealment of evidence. *Warden* v. *Hayden* (1967), 387 U. S. 294; *Ker* v. *California* (1963), 374 U. S. 23. But it is simply not true that any exigent circumstances existed which would justify the action of the police in this case. The police did not arrive to open the suitcase until the day after they were called, and they certainly could have applied for a warrant before the search—or, indeed, they could have taken the suitcase itself to a magistrate. To allow such a search as was conducted here needlessly sacrifices the public interest in the privacy and security of an individual's possessions.

The majority suggest, at least by implication, that the suitcase was suspicious by reason of the sounds emanating from it, its weight, the demeanor of the person who checked it, and the length of time it was checked. Yet not one of these facts, and no combination of them, provide any reasonable basis for a warrantless search claimed to be for the purpose of protecting the public safety. It is claimed that the bag felt unusually heavy. Is that any indication that it might have held a bomb—or narcotics, or books, or any one of the other objects one might imagine? The suitcase made a "rustling" sound when moved. If there is some sinister implication from that sound it escapes me; certainly, it seems most unlikely that explosives "rustle." The man who checked the bag was "tense and nervous." Does that suggest that the bag contained a bomb? The bag was left for a few days longer than expected. Wouldn't this lapse of time indicate, if anything at all, that the contents were probably innocent? None of these "suspicions" reflects anything other than certain differences between this bag and the millions of others that pass through the hands of common carriers every year. There were no suspicious

sounds, no odors, no leakages, no threats or past incidents suggesting any danger to the public safety. In particular, this is not a case in which any bomb threat was made or, in which there was any other reasonable basis for suspecting an imminent danger to the public safety. The circumstances surrounding the actual opening of the bag also dispel any contention that its potential contents engendered fear of imminent danger in either the railroad employees or the police; the opening occurred in a small room and was attended by five people who crowded around the bag. By the majority's decision, it is difficult to avoid the conclusion that the police are now at liberty to open anyone's baggage upon the request of any private citizen, without the need to justify the search before an independent magistrate.

The majority concludes that the restrictions of the Fourth Amendment are not applicable to these appeals because the train station search was a private search. Although I disagree with that conclusion, I agree with the majority that the standards developed by the United States Supreme Court for determining, under the now defunct "silver platter" doctrine, the degree of federal participation which mandates invocation of the Fourth Amendment to an otherwise state search are analogous to, and helpful in, determining that degree of police participation which is sufficient to require that a search which is otherwise private comply with constitutional rules. However, I believe that the majority, while purporting to apply the standards announced in *Byars* v. *United States* (1927), 273 U. S. 28, does nothing more than cite that case. To me, *Byars* is the only reliable United States Supreme Court decision in this area.[4]

---

[4] A subsequent case, *Lustig* v. *United States* (1949), 338 U. S. 74, also involved federal participation in a state search. In a 5-4 decision, the court held that the federal participation was such as to require application of the Fourth Amendment. The judgment of the court was announced in an opinion written by Mr. Justice Frankfurter. The clear import of this opinion was that a search is a federal search if there was any federal participation in the search and seizure prior to actual appropriation of the seized objects from the premises searched.

The material facts in *Byars* are relatively simple. A state search warrant was issued by an Iowa judge to " 'any police officer of Des Moines, Polk County, Iowa' " (273 U. S., at 29); the warrant authorized the search of the residence of A. J Byars for intoxicating liquor, instruments and materials. For reasons not germane to this discussion, the court stated that the warrant was defective under Fourth Amendment standards. The warrant was given to a Mr. Densmore, the local police officer in charge of the night liquor bureau. He and three other local officers proceeded to execute the warrant. However, before leaving the police station to conduct the search, Densmore asked a federal prohibition agent to accompany the search party; the agent assented. At the residence, the federal agent searched the kitchen and found counterfeit liquor stamps. A local officer found and immediately turned over to the federal agent similar stamps. The stamps were used to convict Byars of a federal crime.

In a unanimous opinion, the court, at pages 32 and 33, held that the search and seizure was subject to the Fourth Amendment:

"While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods. Constitutional provisions for the security of person and property are to be liberally construed, and 'it is the duty of courts to be watchful for the con-

---

Stated negatively, the thrust of the opinion was that a search and seizure is not a federal undertaking only if the illegally seized objects are appropriated by the state agents and then delivered to the federal agents "on a silver platter" (338 U. S., at 79).

Applying this rule to the facts of the present appeals would require invocation of the Fourth Amendment to the October 28th depot search and seizure. The police participation in the search clearly occurred prior to appropriation of the suitcase and its contents. In fact, the police were the appropriating parties; the Penn Central agents did not seize the bag and then turn it over to the police.

stitutional rights of the citizen, and against any stealthy encroachments thereon.' *Boyd* v. *United States,* 116 U. S. 616, 635; *Gouled* v. *United States, supra,* 304. [255 U. S. 298.]

"*The attendant facts here reasonably suggest that the federal prohibition agent was not invited to join the state squad as a private person might have been, but was asked to participate and did participate as a federal enforcement officer, upon the chance, which was subsequently realized, that something would be disclosed of official interest to him as such agent.* The house to be searched contained only four rooms—a dining room, a kitchen and two bedrooms. We are not prepared to accept the view that the local officer thought a force of four men would be insufficient to search these limited premises; and it is significant, in that connection, that he did not ask his superior officer for additional help, but inquired particularly for Adams, who, he knew, was the federal agent. The stamps found were not within the purview of the state search warrant, nor did they relate in any way to a violation of state law. Those found by the agent were held by him as of right and without question; those found by the state officer were considered by both the local officer in charge and the federal agent as things which concerned the federal government alone and then and there were surrendered to the exclusive possession of the federal agent,—a practical concession that he was present in his federal character. *We cannot avoid the conclusion that the participation of the agent in the search was under color of his federal office and that the search in substance and effect was a joint operation of the local and federal officers.* In that view, so far as this inquiry is concerned, the effect is the same as though he had engaged in the undertaking as one exclusively his own.'' (Emphasis added.)

The *Byars* case counsels that if police are present when private citizens conduct an unlawful search, the determinative issue in resolving whether constitutional restrictions are applicable is the character of the police presence. If

the police were present primarily upon the chance that something of official interest might be discovered, compliance with the Fourth Amendment is required.

One reason given by the majority to support its conclusion that the October 28th search was a private search is the fact that the search "was instigated by private individuals, for private purposes * * *." However, the mere fact that the police do not initiate a search does not preclude a finding that the police joined in the search to fulfill an investigative function. Such a finding would convert the search from an exclusively private search into a joint venture between the police and the private individuals.

The majority states that the police "had every right to be present at the unlocking and opening of the bag in pursuance of their duty to safeguard the safety of the community from the threat of harm." To the extent that this statement indicates the majority's conclusion that the police presence and activity in unlocking the suitcase was justified by exigent circumstances, it simply is a contradiction of the facts in the record. However, to the extent that it reflects the majority's conclusion that the police went to the train station primarily to ascertain the contents of the suitcase, it is accurate. Their purpose was to search the suitcase, and a warrant should have been obtained before that search.

The "community caretaking function" mentioned in *Cady* v. *Dombrowski* (1973), 413 U. S. 433, also does not apply. Any search in the interest of the public safety must have some reasonable basis. In *Cady, supra*, there was some cause for the belief that an off-duty police officer had to carry a revolver at all times and it was standard procedure to retrieve a police service revolver to prevent vandals from getting the weapon. Although the principles underlying that decision are not clear, it appears that the special rules applicable to automobile searches, the fact of a type of police custody of the vehicle, and the existence of exigent circumstances stemming from the difficulties of rural police practice were basic to the decision in that case.

Most importantly, the critical factor was the searcher's reasonable belief that the automobile contained a dangerous, but not illegal, object. None of those factors are present here, and the unusual facts of that case provide no support for the proposition that a search claimed to be for the public safety is somehow not subject to the usual requirement that a warrant be obtained, absent exigent circumstances. See *Almeida-Sanchez* v. *United States* (1973), 413 U. S. 266. If there were reasonable grounds for belief that the public safety required a search, that search could have been carried out under a proper warrant as readily as under police discretion. The majority suggests no reason why a search for purposes of the public safety should not be subject to the usual requirement that a warrant be obtained, nor can I accept the implication that a police search which is not part of a criminal investigation is any less an intrusion upon privacy or any less subject to the Fourth Amendment.

The reliance of the majority upon the "plain view" doctrine is similarly misplaced. As was stated in *Coolidge* v. *New Hampshire* (1971), 403 U. S. 443, 466: "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertantly across a piece of evidence incriminating the accused." Even if the search in the present case is somehow considered to be a private search for explosives, the "plain view" doctrine alone would not permit the police to seize the narcotics in the suitcase, because "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances," even where the article seized is contraband. *Coolidge* v. *New Hampshire, supra,* at 468. A private person making a search has no right to seize property, even contraband, and there is no logic in considering a search to be private until the moment at which the seized object comes into plain view, and then finding that the right to seize derives from the fact that police officers, heretofore considered as private persons, have the object in "plain view." The

mere fact that an object subject to seizure is in plain view does not eliminate the requirement of a search warrant, absent exigent circumstances, for the "plain view" rule only applies where the initial police intrusion was lawful. Here, the police were, at best, participants in an unlawful private search, and, at worst, conducting a police search in violation of the Fourth Amendment. The police intrusion in this case was the picking of the suitcase locks in order to open the bag, and this intrusion was unlawful, without warrant, and not made under exigent circumstances. This wrongful intrusion is not a basis upon which the "plain view" rule can be applied.

A second requirement of the "plain view" rule is that the discovery of evidence must be inadvertant. It is clear that the purpose of the Toledo police was to participate in a baggage search, and that if explosives had been found, the explosives would have been liable to seizure, or at least to use as evidence against the owner of the bag. They would incriminate as surely as narcotics. It is absurd to argue in this situation that the discovery of the contents of the suitcase was in any way inadvertant, since their discovery was precisely the purpose for breaking into the suitcase. In Fifth Amendment cases, the fact that a judicial inquiry is not for the immediate purpose of criminal prosecution does not prevent the assertion of the privilege against self-incrimination; so too in Fourth Amendment cases the fact that a warrantless search was for one type of evidence does not act as a bootstrap to justify the seizure and use of evidence of a different kind, for the unwarranted invasion of privacy remains the same.

The cases applying the Fourth Amendment to warrantless search and seizure cannot be reconciled into a set of simple principles. In many of those cases, there is a tension between two conflicting approaches. One approach considers that if a police search is subsequently found to be reasonable, no warrant is necessary, since the warrant requirement applies only to unreasonable searches. The majority apparently adopts that approach in this case. The other approach recognizes that the primary protection of

the Fourth Amendment against unbridled police discretion lies in the requirement that a warrant be obtained from an impartial magistrate, and that the fundamental guarantees of the Fourth Amendment are eroded whenever the decision that a search is reasonable is made by a police officer, regardless of his good faith, except in exigent circumstances. Hard cases make bad law; but the result of this case inevitably reduces the security of every person's property and effects against unconstitutional police intrusion, and undermines the simple principle "that the police must obtain a warrant when they intend to seize an object outside the scope of a valid search incident to arrest." *Coolidge* v. *New Hampshire, supra,* at 484.

Accordingly, I dissent.

O'NEILL, C. J., concurs in the foregoing dissenting opinion.