The STATE of Ohio, Appellee,

v.

WILLIS, Appellant.

[Cite as *State v. Willis*, 169 Ohio App.3d 364, 2006-Ohio-5754.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 2005–CA–116.

Decided Oct. 27, 2006.

William F. Schenck, Green County Prosecuting Attorney, and David D. Hayes, Assistant Prosecuting Attorney, for appellee.

Laura J. Martin, for appellant.

BROGAN, Judge.

{¶ 1} Matthew Willis appeals from his convictions of possession of criminal tools, aggravated possession of drugs, possession of cocaine, and illegal manufacture of drugs pursuant to his no-contest pleas. Willis's conviction stems from his arrest after police executed a search warrant at his residence on October 22, 2004, in Cedarville, Ohio, and recovered drug-related evidence. Appellant's sole assignment of error is as follows:

{¶ 2} "The trial court erred in overruling appellant's motion to suppress evidence seized from his home where the initial search of his home upon which the warrant was based was conducted by a confidential informant acting as an instrumentality or agent for the State for the purposes of gathering information pertaining to a crime and not as a private individual."

{¶ 3} Detective Gary Mader of the Fairborn Police Department provided the following affidavit on October 22, 2004, in support of his request for the search warrant:

{¶ 4} "1. The Affiant, Detective Gary R. Mader is employed by the Fairborn Police Department and has been so for approximately seven (7) years. He has been assigned to the Greene County A.C.E. Task Force since April 2003. During this time Detective Mader has attended several training seminars on apprehension of drug traffickers, and drug investigations. Detective Mader has also received formal advanced training from the Drug Enforcement Administration related to investigating drug offenses. Detective Mader has extensive experience in investigating drug cases that resulted in successful prosecution of persons directly and indirectly involved in trafficking drugs, marijuana cultivation, and manufacturing drugs.

{¶ 5} "2. On or about 10/21/2004 a confidential, reliable, and credible informant (herein referred to as CS# 1) contacted Officer Matthew Berry of the Cedarville Police Department to discuss a possible indoor marijuana grow operation located within the Village of Cedarville, Ohio. CS# 1 has provided information to Officer Berry in the past which he has been able to confirm through independent investigation and observations. During their conversation, CS# 1 told Officer Berry that he/she was inside the residence of Matthew A. Willis at 71 West Xenia Ave., Apartment # 4, Cedarville, Ohio 45314 on or about the evening of 10/21/2004. While inside the apartment, CS# 1 observed several metal type pans containing soil like material and growing mushrooms. CS# 1 additionally smelled a strong odor of raw marijuana.

{¶ 6} "3. On or about 10/22/04, The Affiant and Officer Berry personally met with CS# 1. The informant stated that he/she has known Matthew A. Willis for

over six (6) months. CS# 1 has stayed with him at his residence at 71 West Xenia Avenue, Apartment 4, Cedarville, Ohio 45314 on numerous occasions.

{¶ 7} "4. CS# 1 has personally seen live growing marijuana plants growing within Apartment # 4 of 71 West Xenia Avenue, Cedarville, Ohio 45413 throughout the length of knowing Matthew A. Willis. CS# 1 observed eight (8) marijuana plants growing in a third bedroom of the apartment within the past two weeks. Those plants were in various stages of growth, and planted in various size pots. Fluorescent lights were positioned above the plants. Various bags of commercial fertilizer, peat moss, sand, and straw were also present in the same room. CS# 1 could smell a very strong odor of raw marijuana.

{¶ 8} "5. CS# 1 has had conversations with Matthew A. Willis concerning his marijuana grow. Willis told CS# 1 that he has been growing marijuana for quite some time and sells the marijuana which he grows. He has discussed various techniques and 'tricks of the trade' of growing marijuana with CS# 1. CS# 1 has further witnessed Matthew A. Willis exchange marijuana and psilocin mushrooms for U.S. currency in numerous drug transactions. CS# 1 has been present at his residence when unknown persons have come to his residence and requested to purchase marijuana and psilocin mushrooms.

{¶ 9} "6. On 10/21/04, CS# 1 observed 3 metal type pans containing soil like material enclosed in a plastic container within the bedroom of Matthew A. Willis inside his residence at 71 West Xenia Avenue, Apartment # 4, Cedarville, Ohio 45314. Inside those pans, were numerous live, growing psilocin mushrooms. There was plastic tubing going into the plastic containers to provide humidity to the growing mushrooms. Matthew A. Willis has told CS# 1 that he grows psilocin mushrooms to sell. CS# 1 has seen Matthew A. Willis harvesting these mushrooms in the recent past. He told CS# 1 that he had to harvest them before they started dropping their spores, therefore losing their hallucinogenic properties. CS# 1 also observed several empty syringes around Willis' apartment which once contained the psilocin spores. Willis informed CS# 1 that he orders the psilocin spores and has them delivered to his residence at 71 West Xenia Avenue, Apartment # 4, Cedarville, Ohio 45314.

{¶ 10} "7. CS# 1 identified several vehicles which Willis owns, including a 1980's Ford Van, and a 1990's Ford Tempo. The Affiant confirmed through LEADS Database that a 1987 Ford Station wagon and a 1990 Ford 4 door are titled to Matthew A. Willis. CS# 1 additionally stated that he has recently been driving a dark colored sport utility vehicle owned by Willis' sister and has an orange Ford Probe parked at his residence. The Affiant confirmed through personal observation on 10/22/2004 that an orange Ford Probe and a blue Isuzu sport utility vehicle were parked directly in front of the stairs leading to Willis'

apartment. The Isuzu bore Ohio registration H418194. LEADS Database indicated that the vehicle was registered to Melanie Willis.

{¶ 11} "8. CS# 1 stated that Matthew Willis is employed by Friend's Extended Care Center in Yellow Springs, Ohio as a STNA. The Affiant spoke to an unidentified manager at Friend's Extended Care Center on 10/22/2004 who confirmed that Matthew A. Willis is currently employed at their facility.

{¶ 12} "9. On 10/22/2004 Detective Craig Polston of the Greene County A.C.E. Taskforce made contact with a black male resident of the apartment described in Paragraph III of the Search Warrant in this matter. That black male identified that apartment as apartment # 4. Detective Polston was further able to positively identify that black male as Matthew A. Willis through a Ohio Bureau of Motor Vehicles Image obtained through the LEADS Database. Detective Polston further observed that all of the windows to the residence that he could observe were covered or blocked by blinds.

{¶ 13} "10. On 3/13/2000, Detective David Tidd of the Greene County Sheriff's Office and members of the Greene County Interagency Investigative Unit conducted a search of Matthew A. Willis' residence at 60 East Columbia Pike, Apartment # 4, Cedarville, Ohio 45314. During that search, detectives found marijuana, pots with germinating marijuana seeds, grow lights, and additional growing paraphernalia. Several pieces of literature were also seized detailing the growing of psilocin mushrooms and hand written letters indicating that Willis was growing mushrooms. Willis was subsequently charged with Cultivation of Marijuana, fourth degree misdemeanor, and pleaded guilty as charged.

{¶ 14} "11. Based on the experience of the Affiant and other members of the Greene County A.C.E. Task Force, strong pungent odors of raw marijuana, obstructed views of an interior of an area of a dwelling are consistent illicit indoor marijuana grows. The Affiant further states that he has good reason and probable cause to believe that with the residence, described above, will be evidence of marijuana growing, to wit: marijuana plants in a growing state, sticks, pots, lights and other paraphernalia used to grow and cultivate marijuana; drug paraphernalia employed to smoke marijuana, criminal tools used to cultivate, package, and traffic marijuana; and miscellaneous items used to package, smoke, traffic, store and cultivate marijuana; papers, instructions, and documents associated with the growing, cultivation and harvesting of marijuana and/or psilocin mushrooms, spore containers, packages, and the like.

{¶ 15} "12. Based upon the above facts and beliefs, and in my experience and in the experience of other members of the Greene County A.C.E. Task Force, traffickers in controlled substances frequently have weapons in or near areas where narcotic sales are made. Additionally they often use remote locations, and/or safes to store drugs and U.S. currency derived from selling illicit drugs.

They frequently use portable pagers, cellular telephones, and telephone answering machines as a means of contacting one another. Traffickers also frequently have ledgers or books indicating sources, amounts and sales. Cash is also frequently found in larger than usual amounts. Video and audio surveillance equipment is often used to monitor movement of people and vehicles around where sales are made. Traffickers in illegal substances also act with other individuals in gang activity to protect their enterprise and attempt to control their neighborhood, to limit their exposure to be detected to law enforcement. Affiant requests that a Warrant be issued to the proper police authority authorizing a personal search of the above described residence and vehicles for items and things named, and for a search of the described place(s) and things for said items of property; and, if said items of property or any part thereof, are found in the place(s) or in things described, authority is requested to seize said items of property which may be found.

{¶ 16} "V. The Affiant further states that he has good reason and probable cause to believe that within the residence, described above, will be evidence of the violations of the Ohio Revised Code described in Paragraph 'I' of the search warrant.

{¶ 17} "VI. Affiant further states there is no urgent necessity for said search to be conducted in the nighttime hours."

{¶ 18} Prior to trial, Willis moved to suppress the evidence recovered from his residence, contending that the information provided to police by the confidential informant was obtained by the informant through an unlawful search. Specifically, Willis contended that the confidential informant obtained the information by entering his home surreptitiously at the request of Officer Matthew Berry of the Cedarville Police Department.

{¶ 19} At the suppression hearing, Officer Daniel Foreman of the South Charleston Police Department testified that he was contacted in October 2004 by a former girlfriend of Willis's, Amanda Jo White, who told him she had a friend who owed her $60 but would not pay her and she wanted to know how to turn him in for "having a drug house." Foreman testified that he had put White in contact with Officer Berry, since her friend's (Willis's) apartment was located in Cedarville. Foreman said he had little or no contact with White until the search warrant was executed. Foreman said White later called him and was remorseful for having turned Willis in for the $60 debt he owed her.

{¶ 20} Officer Berry testified that Amanda White called him on October 21, 2004, and told him that Willis was growing marijuana and mushrooms at his residence. She told Berry she wanted to get back at Willis because he owed her money and was refusing to pay her. Berry said that White had told him she was going to Willis's house that evening to find out what was there. Berry said he

believed White had an ongoing relationship with Willis and was an occupant of his residence. Berry said he made arrangements with White to meet her at the police department to learn what she had discovered at Willis's apartment. Berry denied asking White to enter Willis's apartment. Berry said that White told him that she had entered Willis's apartment and observed Rubbermaid containers with mushrooms growing in them and mushroom pans used to grow mushrooms and that the apartment smelled heavily of marijuana. Berry denied that White had ever told him that she had not been in Willis's apartment for a month or more. On cross-examination, Berry denied knowing that White was entering Willis's apartment without Willis's authorization. He said that he believed she was still in a relationship with Willis and was still going in and out of his apartment and had personal items there. Berry said that he knew that White did not have a key to Willis's apartment, but she had told him she knew how to break in because there was something wrong with the door. Berry said he did not think White's entry would be unauthorized, because "she had been staying there." Berry said he did not know when White stayed at Willis's apartment last. Berry said that White told him one of the rooms in Willis's apartment was padlocked because marijuana was in that room, so she did not see the marijuana.

{¶ 21} White testified that she had been contacted by Berry to get information about Willis. White said that Berry told her that he knew Willis had marijuana plants and other illegal things in his apartment and that he needed her to tell him everything she knew so that they could raid his house. White said she told Berry she did not know anything because the last time she had been in the house was the beginning of September 2004. White said she told Berry about the items she knew had been in Willis's apartment the last time she was in the apartment in the beginning of September. White said that Berry told her that the information was not "current" and asked her to go into the apartment and find out what was there. She said that Berry told her, "I'll deny this but call me when you're done." White said she went to Willis's apartment, but the room inside was padlocked.

{¶ 22} In overruling Willis's suppression motion, the trial court made the following factual findings and legal conclusions:

{¶ 23} "Defendant claims that the information supplied from the search warrant to Det. Mader by the confidential informant was encouraged by Officer Berry knowing that the confidential informant had no right to enter the premises in which the contraband was found.

{¶ 24} "The confidential informant initially advised an officer of the South Charleston Police Department that she had information regarding contraband in the residence in question, and she was put in contact with Officer Berry. The confidential informant claims that Officer Berry encouraged her to go into the

property in question occupied by the Defendant and secure information regarding the contraband upon which information the search warrant was based. The confidential informant claims she did not have authority to enter the premises and the only reason she went there was because of Officer Berry's request. She claims she did not have permission to enter the premises. The confidential informant denies that she contacted law enforcement agencies on her own.

{¶ 25} "Officer Berry testified that in response to a call from Officer Foreman he contacted the confidential informant. He says the confidential informant advised him that the Defendant, Matthew Willis, was growing marijuana in his house and had mushrooms and she described the type of container he was using. Officer Berry said she was upset with Mr. Willis because he owed her money and would not pay her. He further states that the confidential informant advised him she was going to the house to find out what was in there that particular evening. He claims he understood she had an ongoing relationship with Matthew Willis and was an occupant of the resident. [Sic.] Officer Berry had previously received information from her while working for another department and her information had been reliable. He denies asking the confidential informant to go into the house. He claims she was very persistent about going into the apartment and that the officer believed she had been staying there with the Defendant. Subsequent to her going into the apartment, she provided information to Officer Berry which was then provided to Det. Gary R. Mader who executed the Affidavit for the search warrant which was issued by the Municipal Court.

{¶ 26} "The Court after considering all of the testimony and evidence, including the exhibits, finds Officer Berry and Officer Foreman's testimony to be more credible than that of Amanda White regarding the circumstances under which Amanda White entered the premises occupied by Matthew Willis. According to Officer Berry, Amanda White never told him she had not been in the residence for a month or so and that he did not ask her to go into Matthew Willis' residence. He believed her to be a cohabitant and Officer Foreman indicated that she expressed remorse to him after the fact for turning in Matthew Willis."

{¶ 27} Appellant contends that the uncontradicted evidence before the trial court established that the confidential informant, Amanda White, was acting as an agent of the state when she broke into Willis's home to obtain evidence.

{¶ 28} The unlawful acts of private individuals in conducting illegal searches and seizures are not subject to constitutional proscription. When, however, a warrantless search is not an exclusively private undertaking but involves some degree of police participation, the courts must look to the facts surrounding the search in order to determine whether it was an unreasonable police search or whether it was a private search. *State v. Morris* (1975), 42 Ohio St.2d 307, 71 O.O.2d 294, 329 N.E.2d 85.

{¶ 29} In *Morris*, law enforcement officers were summoned by railroad personnel to assist them in unlocking a suspicious piece of luggage to ascertain the nature of its contents. Id. at 313–315, 71 O.O.2d 294, 329 N.E.2d 85. The railroad personnel were concerned that the suitcase might contain unlawful or even dangerous materials due to its characteristics and the unusual circumstances under which it had been checked. Id. After unlocking the luggage at the request of railroad personnel, police officers remained present while the railroad personnel immediately opened the luggage and discovered bags of cocaine and heroin in plain view. Id. at 315, 71 O.O.2d 294, 329 N.E.2d 85. Under the circumstances, the court found that the search of the luggage constituted a private search. Id. at 332, 71 O.O.2d 294, 329 N.E.2d 85. The court made particular note of the fact that had it not been for the difficulties that the railroad personnel experienced in attempting to open the suitcase, the inspection might have remained an exclusively private undertaking without law-enforcement involvement. Id. at 320, 71 O.O.2d 294, 329 N.E.2d 85. The search in *Morris* was instigated by railroad personnel acting as private individuals for the private purpose of ensuring the safety of everyone in the terminal. Id. at 319–320, 71 O.O.2d 294, 329 N.E.2d 85. Local police were present only at the request of railroad personnel and had the right and duty to remain present while the suitcase was opened, in furtherance of public safety. Id. at 322, 71 O.O.2d 294, 329 N.E.2d 85. There was no evidence that police had prior knowledge or suspicion of contraband within the suitcase and were not present with the specific intent of discovering evidence of a crime. Id. at 320, 71 O.O.2d 294, 329 N.E.2d 85.

{¶ 30} Of the factors set forth in *Morris*, Ohio courts have paid particular attention to whether or not the search in question was initiated by a private person and for private purposes. See, e.g., *State v. Knapp* (July 11, 2001), Wayne County App. No. 00CA0073, 2001 WL 773230; *State v. Dillon* (Jan. 23, 1991), Miami County App. No. 90–CA–07, 1991 WL 6347; *State v. Henry* (1981), 1 Ohio App.3d 126, 439 N.E.2d 941. For example, no state action was found in *State v. Dillon*, a case in which a landlord had entered a rented apartment to inspect its condition after noticing suspicious activities and damage to common areas shortly after the tenant moved in. After entering the apartment, she discovered what she believed were marijuana leaves, and she requested the sheriff's department to come to the scene immediately. Id. Law-enforcement officials became involved in the search in *Dillon* only upon the landlord's request and without prior knowledge of any crime or with the specific intent to obtain evidence of a crime.

{¶ 31} Similarly, in *State v. Knapp*, an investigating officer contacted the owner of a property to determine the name of the leasing tenant and informed her that he had received information that marijuana might be growing on the premises.

The property owner then requested the officer to accompany her on an inspection of her property. Once inside the premises, the officer discovered growing and drying marijuana and obtained a search warrant for the premises. The reviewing court held that the trial court in *Knapp* had erred in suppressing evidence seized from the premises, because the landowner initiated the search for purposes of inspecting and protecting her property and the officer was present only at her insistence and for her safety. The officer in no way prompted, encouraged, or suggested the search, which was conducted by the property owner for her own private purpose.

{¶ 32} Appellant argues that the interaction between White and the police was a "set up * * * designed to circumvent Mr. Willis' constitutional protections." Willis argues that "any other conclusion would blur the line between private action and state action so as to make the distinction impossible and virtually meaningless."

{¶ 33} The trial court chose to believe Officer Berry when he testified that he had not asked White to enter Willis's residence to search for drugs. Also, the court stated that it believed Officer Berry's testimony that he did not know that White had not been residing at Willis's residence for a month before she entered Willis's apartment on October 21, 2004. The trial court was not required to believe White's testimony, particularly since she expressed regret at having provided information to police that led to the arrest of her former boyfriend. The trial court was, of course, in the best position to assess the credibility of White and Berry. In light of the trial court's credibility finding, we cannot conclude that the trial court erred in finding that White was not an agent of the police when she entered Willis's apartment. The assignment of error is overruled.

{¶ 34} The judgment of the trial court is affirmed.

Judgment affirmed.

DONOVAN, J., concurs.

GRADY, P.J., dissents.

GRADY, Presiding Judge, dissenting.

{¶ 35} I respectfully dissent from the decision of the majority.

{¶ 36} The Fourth Amendment protects persons from unreasonable searches and seizures by government officers. Therefore, a search performed by a private person for purposes independent of any governmental function does not implicate the Fourth Amendment's protections, notwithstanding the fact that the search

yields evidence subsequently used in a criminal prosecution by the government of the person whose premises were searched.

{¶ 37} This "private search" exception to the Fourth Amendment is itself subject to an exception. When the conduct of a private person or entity is "essentially a public function," *Marsh v. Alabama* (1946), 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265, state action can exist. Though *Marsh* involved the First Amendment, its rationale has been extended to application of the Fourth Amendment to hold that private searches undertaken "to assist criminal prosecutions may be * * * an inherently governmental task." *Stapleton v. Superior Court* (1968), 70 Cal.2d 97, 104, 73 Cal.Rptr. 575, 447 P.2d 967. Then the government's subsequent use of evidence obtained by a private person for the purpose of aiding a criminal prosecution is suppressed under a "ratified intent" theory. See LaFave, Search and Seizure (4th Ed.2004) Section 1.8(f). Even then, however, the rule does not apply when the evidence was obtained by the private person for that purpose without any prior involvement of government officials. Id. at fn. 229.

{¶ 38} In the present case, the search was proposed and executed by a private person, White, and though she was motivated by a desire for retribution, the search was not performed for a private purpose. Rather, its expressed purpose was to obtain evidence implicating defendant in committing drug offenses. There was no other purpose for the search independent of that goal. Further, unlike in the cases cited in the majority opinion, White's purpose was made known to Officer Berry prior to the search, and his instruction to her was to report back to him any observations she made that could implicate defendant in the drug offenses alleged. Under those circumstances, the search White performed was essentially a public function, not a private function, and the search is subject to the prohibitions imposed by the Fourth Amendment. Lacking a prior warrant or any exception to the warrant requirement, the search was unreasonable and therefore illegal.

{¶ 39} The observations that White made in her warrantless search of defendant's home were presented as probable cause for the warrant police obtained to perform the search that yielded the evidence that defendant sought to suppress. Any illegality in obtaining the facts upon which a search warrant is issued taints the warrant as well as the legality of the search and seizure performed pursuant to the warrant. Nevertheless, suppression may yet be avoided on the good-faith exception explained in *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677. I would reverse the judgment and remand the cause for that determination.