[Cite as *State v. James*, 2023-Ohio-3524.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

KEMARI D. JAMES,

        Defendant-Appellant.

CASE NO. 2022-T-0107

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00329

---

## O P I N I O N

Decided: September 29, 2023
Judgment:  Affirmed

---

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Michael A. Partlow*, P.O. Box 1562, Stow, OH 44224 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1}  Defendant-appellant, Kemari D. James, appeals from his convictions for Murder, Attempted Murder, Having Weapons While Under Disability, and Escape, and the denial of his motion to suppress evidence, in the Trumbull County Court of Common Pleas.  For the following reasons, we affirm the judgment of the lower court.

{¶2}  On May 20, 2020, James was indicted by the Trumbull County Grand Jury for two counts of Murder (Counts One and Two), in violation of R.C. 2903.02(A); Attempted Murder (Count Three), a felony of the first degree, in violation of R.C. 2903.02(A) and R.C. 2923.02(A); Aggravated Robbery (Count Four), a felony of the first

degree, in violation of R.C. 2911.01(A)(1) and (3); Having Weapons While Under Disability (Count Five), a felony of the third degree, in violation of R.C. 2923.13(A)(2); and Escape (Count Six), a felony of the fifth degree, in violation of R.C. 2921.34(A)(3). Counts One through Four had firearm specifications under R.C. 2941.145 and repeat violent offender specifications under R.C. 2941.149. Count Five also had a firearm specification.

{¶3} On July 13, 2020, James filed a Motion to Suppress Evidence. He requested to suppress his identification in a photo lineup as the lineup was "unnecessarily suggestive" and not conducted in compliance with statutory rules. He also requested to suppress evidence seized from a search of his phone and from his cell phone records obtained from the phone provider, arguing that the warrants to search were invalid because they contained hearsay and failed to establish probable cause.

{¶4} A suppression hearing was held on October 16, 2020. The following testimony was presented:

{¶5} Andre Haynes was at the home of La'Nesha Workman, his girlfriend, on the night of April 17, 2020. James, Haynes' friend, came to the home and asked for a ride. He then told Haynes he was going to kill him, due to a belief that Haynes stole items from him, and ordered Haynes and Workman to get on their knees. James fired the gun, a struggle ensued, and Haynes ran for help. When the police responded, he told them James was the shooter. Haynes subsequently selected James from a photo lineup, stating he was "200 percent" confident he was the man who committed the crimes.

{¶6} Warren Police Department Officer Taylor Romain testified that, on April 17, she was the "blind administrator" of a photographic lineup using a folder system. She was not part of the investigation, although she had responded to Haynes' call to police

2

after the shooting. She was provided with a folder of a series of pictures, not prepared by her, each of which contained a photo in a separate folder. She testified, "I didn't know who Kemari James was. I wasn't familiar with him or anybody else in the folder." She then showed Haynes each of the photos and "he was able to point out right away who it was." She did not believe Haynes to be under the influence of drugs or alcohol when making the identification.

{¶7} April Riggins, Workman's mother, testified that she went to clean out Workman's house after her death. At that time, she gathered cell phones from the home and took them to her residence. Riggins located one phone behind the television stand in the living room and, when looking through its contents on May 1, she saw a photo of James' driver's license. Her husband called the detectives on May 4 to inform them about the phone and it was subsequently turned over to the Warren Police Department.

{¶8} Former Warren Police Department Detective Thomas Wire interviewed Haynes on the night of the shooting. Haynes indicated the shooter was known to him and provided James' name. Wire testified that Haynes appeared distraught but coherent. He did not have the smell of alcohol on his person but had slightly glossy eyes. When asked if Haynes was drunk, he indicated that it was a possibility and stated: "Perhaps there might have been * * * alcohol consumption." Regarding the photo lineup, Wire indicated he participated in its preparation and did not recall whether Romain was involved in the investigation of the case.

{¶9} Detective Wire prepared a search warrant for the phone provided to him by the Rigginses, based on the proximity of the phone to the location of the homicide and the existence of the photo of James on the phone. The warrant was signed on May 12,

3

2020. After reviewing the phone and finding it associated with a Gmail account, a search warrant for that account was obtained on June 4, 2020.

{¶10} Detective Michael Altiere of the Warren Police Department obtained a search warrant for Sprint cell phone records relating to a phone known to be owned by James on April 21, 2020, requesting incoming and outcoming calls and text messages and cell site data.

{¶11} The court issued a Judgment Entry on December 30, 2020, overruling the Motion to Suppress. The court found that the photos utilized in the lineup were all of black males of the same age with close cropped hair and slight facial hair that was well-trimmed. The court found that the identification procedure was not unduly suggestive and emphasized that Haynes knew the defendant well. It found that the cell phone in Workman's home was abandoned and, nonetheless, police obtained a warrant to search it supported by probable cause. It found that the other warrants to search cell phone records were also obtained properly.

{¶12} A jury trial was held on October 3 through 7, 2022. The following pertinent testimony and evidence were presented:

{¶13} Andre Haynes testified that on April 17, 2020, he and Workman, who was pregnant at the time, were playing video games in Workman's home. James knocked at the door and they let him inside the home, where James had been multiple times. James entered and he and Haynes had a conversation. James asked for a ride. When Haynes reached to get his keys, he turned around and saw James pointing a gun at him. Although he initially thought James was joking, James stepped back and said he was going to kill him, accusing Haynes of stealing from him. Haynes denied this allegation and tried to

4

dissuade James. James told him and Workman to get on their knees. Haynes turned around to tell Workman he loved her and heard "shots ring out." He fell down and thought he was shot. Haynes got up and "rushed" James, fought with him, the gun went off, and then it jammed. The two men went outside, continuing to struggle over the gun. Haynes then took off running to a neighbor's home to ask for help. He heard James in the distance "yelling, walking through the neighbor[hood]." Haynes testified that the scratches on his hand and an abrasion of his knee depicted in photographs were a result of the struggle over the gun with James.

{¶14} Several Warren City Police Department officers were dispatched to calls on April 17, 2020, which indicated that a male, later identified as Haynes, was at a neighbor's house, stating there had been a shooting. Warren Police Officer Joseph Black indicated that, upon responding, Haynes was standing on a back porch a few blocks from where the shooting took place. Haynes seemed "very nervous," was shaking, fumbling his words and said "I think I've been shot." He said that a man named Kemari James had been in his home, the two struggled over a gun, and it went off. Haynes provided a physical description of James. Officer Timothy Ladner also indicated that Haynes identified James as the individual who shot at him and Workman and described that Haynes appeared worried and was visibly shaking.

{¶15} Sergeant Jeff Orth responded to Workman's residence. Upon approaching the back door of the residence, he observed that it was open. Workman was lying on the floor of the living room next to the couch, where two young children were sitting. Detective Brian Crites investigated the scene. He recovered six casings from the living room area of Workman's home as well as multiple bullets. He observed several gunshot wounds to

5

Workman.

{¶16} Detective Nicholas Carney indicated that Haynes provided the name of James as the suspect. In response, he prepared photos for a lineup which was administered by Officer Taylor Romain.

{¶17} Officer Romain indicated that she responded to the calls and encountered Haynes, who said James had shot at him and his girlfriend. She administered a photo lineup to Haynes on the date of the shooting, who identified James as the shooter, indicating he was "200 percent positive."

{¶18} Dr. George Sterbenz, a forensic pathologist from the Trumbull County Coroner's Office, testified that Workman suffered seven gunshot wounds, including a wound to her head, shoulder, three to her left arm, one to her right arm, and one to her breast. He indicated that she was pregnant and in her third trimester at the time of her death.

{¶19} April Riggins, Workman's mom, relayed the same information about recovering James' cell phone that was provided at the suppression hearing. On May 4, 2020, Detective Carney went to the Riggins' home to recover the cell phone.

{¶20} Detective Altiere used Cellebrite software on the phone recovered by Riggins. He observed that there was an e-mail address with James' name associated with the phone. The last call made with the phone was February 21, 2020. Altiere also assisted in locating James after the incident. He utilized information relating to another phone number, ending in 3232, which he had been informed was associated with James.

{¶21} Altiere was able to use cell phone data to determine that the 3232 cell phone was in the vicinity of Workman's house at the time of the murder, with a margin of error

6

of 37 meters within an arc drawn around the area including her home. The arc encompassed an area about one-fourth the size of Warren. Michelle Blackwell testified that her phone was used by Workman to call the number associated with James and she provided that number, ending in 3232, to the United States Marshal.

{¶22} Detective Chris Hoffman of the U.S. Marshals Task Force testified that they were informed of a potential fugitive in their area. They located James in the basement of a residence in Baltimore in May 2020.

{¶23} Tiphanie Polinori testified that James was on post-release control on the date the offenses were committed and was required to obtain a written travel permit from the Adult Parole Authority before leaving the state of Ohio. She learned that he was apprehended in Maryland and testified that he had not received permission to leave Ohio at that time.

{¶24} Jasmine Workman, the victim's sister, testified that when she was at a pretrial in this matter, James came over and said "that he was going to put bread over my head and get me killed like he did my sister." Deputy Ryan Verbosky of the Trumbull County Sherriff's Office also testified that when he was escorting James into the courtroom, James stated to Workman's family members: "I'll put bread on all your heads and I'll kill all of you."

{¶25} Jonathan Gardner, a forensic scientist at BCI, examined the cartridges. He determined that all six cartridges were fired by the same firearm. Brittani Troyer, forensic scientist in biology DNA at BCI, testified that although DNA was swabbed from the shell casings, it was not of sufficient quality for comparison due to insufficient data.

{¶26} Following the State's presentation of evidence, the trial court granted

7

James' Crim.R. 29 motion to dismiss the count of Aggravated Robbery. The jury found him guilty of the remaining counts and accompanying firearm specifications. The court found James to be a repeat violent offender.

{¶27} Following a sentencing hearing, the court sentenced James to concurrent terms of 15 to life on the Murder counts with three-year consecutive terms for firearm specifications on both counts and a seven-year consecutive term for the repeat violent offender specification on the first count. It ordered he serve a term of 10 to 15 years for Attempted Murder and a consecutive term of three years for the firearm specification, three years for Having Weapons While Under Disability and a consecutive three-year term for the firearm specification, and one year for Escape. The terms for Having Weapons While Under Disability and Escape were ordered to run consecutively. This sentence was memorialized in an October 24, 2022 Judgment Entry.

{¶28} James timely appeals and raises the following assignments of error:

{¶29} "[1.] The trial court erred and violated appellant's constitutional rights by denying appellant's motion to suppress evidence.

{¶30} "[2.] Appellant received ineffective assistance of counsel in violation of his constitutional rights in that regard.

{¶31} "[3.] The appellant's convictions are against the manifest weight of the evidence."

{¶32} In his first assignment of error, James raises several arguments in support of the conclusion that his motion to suppress should have been granted by the trial court.

{¶33} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

8

"[A]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence," but "must then independently determine, without deference to the conclusion of the trial court [i.e., de novo], whether the facts satisfy the applicable legal standard." *Id.*

**{¶34}** First, James argues that Haynes' identification of him in the photographic lineup should have been suppressed because the lineup was unnecessarily suggestive and did not comport with the procedures set forth in R.C. 2933.83(B). He argues that the officer administering the lineup "was exposed to the investigation as the road officer who initially picked Andre Haynes up" after he called 911.

**{¶35}** In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that the admissibility of a pretrial identification is evaluated under a two-step analysis. *State v. Butcher*, 11th Dist. Portage No. 2016-P-0062, 2018-Ohio-4943, ¶ 46. First, the court must determine whether the identification procedure was "unduly suggestive" and, if it is, it then "ascertains whether there was a substantial likelihood of misidentification." *Id.* "In the second step of the *Biggers* test," the trial court must determine reliability of the identification by considering "the 'totality of the circumstances' under which the pretrial identification was made." *State v. McDade*, 11th Dist. Lake No. 97-L-059, 1998 WL 682360, *4 (Sept. 25, 1998), citing *Biggers* at 199-200. This includes consideration of "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (Citation omitted.) *Id.*

9

Case No. 2022-T-0107

{¶36} R.C. 2933.83(B) provides that "[p]rior to conducting any * * * photo lineup * * * any law enforcement agency * * * in this state that conducts * * * photo lineups shall adopt specific procedures for conducting the lineups." These procedures must, at a minimum, impose the requirements set forth in R.C. 2933.83(B)(1)-(5), which include: "[u]nless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup"; the administrator shall make a written record with results obtained during the lineup which is signed by the witness and includes information about the persons present and the date and time; and the administrator should inform the witness that the suspect may or may not be in the lineup and the administrator does not know who the suspect is. A blind administrator is defined as one "who does not know the identity of the suspect." R.C. 2933.83(A)(2). The failure to comply with this procedure "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(1).

{¶37} At the suppression hearing, Romain did not indicate that she was aware that James was the shooter. She testified that, "I didn't know who Kemari James was. I wasn't familiar with him or anybody else in the folder." This would be consistent with the requirement to have a blind administrator, which is one who does not know the identity of the suspect.

{¶38} James argues, however, that Romain must have been aware of his identity since she participated in the investigation process. He points to Haynes' testimony that he told the responding officers James was the shooter. Haynes did not identify which officers he made this statement to. Further, James notes that Romain and Haynes conversed while Haynes was in her car, but the testimony does not address whether they

10

discussed James as the suspect. The suppression record does not indicate that Romain was informed of James' identity as the suspect.

{¶39} We observe that, at trial, Romain testified that she responded to the scene and heard Haynes identify James as the shooter. However, we cannot consider this in evaluating a motion to suppress. "In reviewing a trial court's decision to deny a motion to suppress, an appellate court is confined to the evidence produced *during the suppression hearing.*" (Emphasis sic.) *State v. Garner*, 11th Dist. Lake No. 2007-L-041, 2007-Ohio-5914, ¶ 45.

{¶40} Even presuming that it was demonstrated at the suppression hearing that Romain was not an appropriate blind administrator, it has been consistently held that a violation of R.C. 2933.83 does not require suppression of the identification. *State v. E.T.*, 2019-Ohio-1204, 134 N.E.3d 741, ¶ 52 (10th Dist.) (while "R.C. 2933.83(C)(1) requires a court to consider evidence of a failure to comply with the requirements detailed in R.C. 2933.83(B), it does not mandate suppression for such a failure"); *see State v. Gaines*, 2016-Ohio-1312, 62 N.E.3d 708, ¶ 28 (11th Dist.). R.C. 2933.83(C)(1) provides only that evidence that procedures were not followed "shall be considered" in ruling on a motion to suppress. The record does not indicate that the identification process was unduly suggestive or that Romain did anything to convey to Haynes the identity of the suspect in the lineup such that there was a violation of the identification mandates in *Biggers*, *supra*. Romain herself did not know what James looked like.

{¶41} Significantly, the fact that Haynes knew James undercuts an argument that the identification was impermissibly suggestive or unreliable under *Biggers*. Haynes was very familiar with James' identity as they were friends and Haynes had seen him many

11

times. This is not the case of an identification of an unknown suspect who the victim had only seen during the commission of the crime. "A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed." (Citation omitted.) *State v. Smith*, 11th Dist. Portage No. 2016-P-0074, 2018-Ohio-4799, ¶ 47. *See State v. Abudu*, 8th Dist. Cuyahoga No. 111837, 2023-Ohio-2294, ¶ 50 (showing a witness a single photograph in a lineup "is not impermissibly suggestive when the witness knew the suspect and identified him by name prior to seeing the photograph).

{¶42} James also argues that the individuals in the lineup "shared nearly no physical traits in common with Mr. James apart from skin color" and had varying hair styles, forehead sizes, and nose shapes. Of note, the trial court found that the photos were "headshots of black males all approximately the same age, with close cropped hair and slight facial hair that was well trimmed." A review of the photos reveals some differences in nose shape, hair line, and skin tone, but is consistent with the trial court's finding. We do not find that the differences in appearance of the men in the photos warrants suppression of the identification. *See Butcher*, 2018-Ohio-4943, at ¶ 50 (identification upheld where all men in the photo lineup were "young African-American males with short hair," although only defendant had a facial tattoo); *State v. Davis*, 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996) (upholding the identification where the complexions of the men varied and they did not share the suspect's curly hairstyle, noting that the defendant need not be surrounded by men "nearly identical in appearance"). Further, it has been observed that where the photo array and the procedures used were not impermissibly suggestive, it is unnecessary to reach a claim that a photo array is

12

unreliable. *Abudu* at ¶ 48. Nonetheless, as observed above, the fact that Haynes was familiar with the suspect bolstered the reliability of his identification.

{¶43} James' contentions that Haynes was intoxicated at the time of the identification do not change this analysis. Haynes identified the shooter by name prior to the photo lineup and selected him from the lineup. Further, there was testimony by Romain that Haynes did not appear intoxicated and Wire merely surmised that "perhaps" Haynes consumed alcohol. The record does not indicate this potential intoxication impacted his initial identification or selection of the photo from the lineup.

{¶44} James next argues that the results of searches of the cell phone recovered by Riggins should be suppressed, emphasizing the right to privacy in one's cell phone. We agree with James that there is a right to privacy relating to one's cell phone. However, we disagree with his arguments that this right was violated.

{¶45} "It is well established that searches conducted without a warrant are per se unreasonable, subject to certain 'jealously and carefully drawn' exceptions." *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 10, citing *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). The Ohio Supreme Court has held that "because a person has a high expectation of privacy in a cell phone's contents, police must * * * obtain a warrant before intruding into the phone's contents." *Smith* at ¶ 23.

{¶46} First, James argues that although his cell phone was discovered in Workman's house, he still had a right to an expectation of privacy relating to that phone and that he did not abandon it or negate that right. Thus, any material discovered on the phone absent a search warrant was inadmissible: "[i]f any data * * * was searched by the

13

WCPD from May 4, 2020 to May 12, 2020 to be used in the course of the investigation, that information was illegally seized and must be suppressed."

{¶47} The testimony indicated that the phone was turned over to the police on May 4 and a search warrant was obtained on May 12. There is nothing in the record demonstrating that police searched the phone between the time they received it and the time that the warrant was obtained. James implies that police may have viewed the phone prior to obtaining the warrant, arguing that "James was nevertheless located through cell phone data and arrested in Baltimore, Maryland on May 5, 2020." There was testimony, however, that multiple warrants were sought relating to separate cell phone data, which included an April 21 warrant relating to data of incoming and outgoing calls and cell sites. There is simply no evidence in the record to indicate that police improperly searched the phone recovered by Riggins to locate Haynes. Given that a warrant was obtained to conduct the search, it is unnecessary to address whether the phone was abandoned.

{¶48} Although April Riggins did look through the phone and discover the photo of James before turning it over to police and before the warrant was obtained, James does not dispute that Riggins' discovery of the photo was not violative of his Fourth Amendment rights. "The unlawful acts of private individuals in conducting illegal searches and seizures are not subject to constitutional proscription." *State v. Morris*, 42 Ohio St.2d 307, 316, 329 N.E.2d 85 (1975). "Generally, the Fourth Amendment only applies to governmental action, and does not apply to searches undertaken by private individuals" with an exception where a private individual acts as an agent of the government, which was not the case here. *State v. Byerly*, 11th Dist. Portage No. 97-P-0034, 1998 WL 637689, *12 (Aug. 21, 1998).

14

Case No. 2022-T-0107

{¶49} James also argues that the May 12 affidavit and search warrant for the phone discovered by Riggins were. deficient and there was a lack of probable cause to grant a warrant.

{¶50} The Supreme Court of Ohio, in *State v. George,* 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), held: "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at paragraph one of the syllabus, quoting *Illinois v. Gates,* 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Whether there is probable cause is based on the totality of the circumstances presented in the affidavit. *State v. Bangera*, 2016-Ohio-4596, 70 N.E.3d 75, ¶ 41 (11th Dist.). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *George* at paragraph two of the syllabus.

{¶51} In the present matter, the warrant was obtained based on April Riggins' discovery of the cell phone in the living room where the murder occurred, as well as her discovery of a picture of the defendant on that cell phone, and the provision of that evidence to the police department through Riggins and her husband, a former Warren

15

Police Department officer known to the officers seeking the affidavit. Such facts provide probable cause to search the phone; there was fair cause to believe it contained evidence that would prove James' presence at the home where the murder occurred.

{¶52} James argues that there was insufficient corroboration of Riggins' credibility or reliability and there was a lack of further investigation to corroborate her claims, emphasizing that the warrant was based solely on Detective Carney's statement that Mr. Riggins asserted his wife had seen James' photo on the phone.

{¶53} We observe that an identified citizen informant "is presumed reliable." *State v. Poff*, 11th Dist. Ashtabula No. 2013-A-0010, 2013-Ohio-5820, ¶ 30. This principle has been applied in relation to information provided by a citizen informant in an affidavit for a search warrant. *State v. Collins*, 2d Dist. Greene No. 2022-CA-40, 2023-Ohio-646, ¶ 12. It also must be questioned what further investigation should have been done to confirm the Ricginses' story. Mrs. Riggins recovered the phone and reviewed its contents. The officers were not present during the discovery and could not review the phone's contents without a warrant. Given the presumption of reliability, and the lack of evidence to the contrary, we do not find their failure to further investigate these statements supports a conclusion that the warrant was improperly granted.

{¶54} In *State v. Dalpaiz*, 151 Ohio App.3d 257, 2002-Ohio-7346, 783 N.E.2d 976 (11th Dist.), cited by James in support of his argument, there were concerns with the veracity of the information supporting the affidavit where there was a confidential informant and much of the information in the affidavit was not attributed to any source. *Id.* at ¶ 36. Here, the officers were aware that the cell phone and information about its contents was obtained from the Ricginses, they knew Mr. Riggins, and they could speak

16

to his credibility. James acknowledges that this information was provided in the request for the warrant. There is no basis advanced to question the Rigginses' veracity. Further, although James notes that the basis for the warrant was hearsay, hearsay information may be relied upon "in whole or in part" when making a probable cause determination, as long as there is a basis for believing the source is credible and a factual basis for the information. *State v. Hudson*, 11th Dist. Trumbull No. 2013-T-0001, 2013-Ohio-4967, ¶ 17.

{¶55} Further, even if there were not probable cause here, the good faith exception would apply, which "permits the introduction of evidence obtained by officers who reasonably relied on a search warrant issued by a neutral and detached magistrate, which warrant was ultimately found to be unsupported by probable cause." *Dalpaiz* at ¶ 39. James contends this is inapplicable due to the following exception to the good faith rule "the officer should have known that the warrant was based on information so lacking in indicia of probable cause that reliance on its validity would be unreasonable." (Citation omitted.) *Id.* We disagree. As described above, the record did not bring into question the reliability or veracity of the Rigginses such that reliance on the warrant was unreasonable.

{¶56} We observe that the affidavit and search warrant referenced by James was not made part of the record before this court for review and the foregoing analysis is based on the parties' description of the content of these documents. However, even presuming that the contents of these records were in dispute and that the affidavit did not provide probable cause for the search, any error would be harmless. "Constitutional errors in the admission of evidence are non-prejudicial when harmless beyond a

17

reasonable doubt." *State v. Williams*, 11th Dist. Trumbull No. 2012-T-0053, 2013-Ohio-5076, ¶ 41.  Error in the admission of evidence is "harmless beyond a reasonable doubt when 'the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt.'" *Id.*, citing *State v. Williams,* 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus.  The cell phone recovered from the residence and its contents provided minimal support for the conviction as it primarily served to confirm James had visited the home where the crime occurred at some point and testimony indicated he had previously visited the residence on multiple occasions.  Given the overwhelming evidence of his guilt which will be discussed further in the third assignment of error, in particular the unequivocal identification by Haynes, James' flight from the state after the crime, and his threats to kill Workman's family members, any error in its admission would have been harmless.

{¶57}  The first assignment of error is without merit.

{¶58}  In his second assignment of error, James argues that trial counsel was ineffective by failing to object to the "flight instruction" given to the jury regarding his leaving the area after the crime was committed.  He contends that for such an instruction to be given, more must occur than merely leaving the scene of a crime and there was nothing to show that James was aware the police were looking for him.

{¶59}  To demonstrate ineffective assistance of counsel, a defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding."  *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668,

18

687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶60} The trial court gave the following instruction to the jury:

> You are instructed that the Defendant's flight from Ohio alone does not raise a presumption of guilt but it may tend to indicate the Defendant's consciousness or awareness of guilt. If you find that the facts do not support that the Defendant fled from Ohio, or if you find that some other motive prompted the Defendant's conduct, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the Defendant engaged in such conduct and if you decide the Defendant was motivated by consciousness or an awareness of guilt, you may but are not required to consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

{¶61} It is "well established that the flight of an accused from justice is admissible as evidence of the consciousness of guilt * * * 'and thus of guilt itself." (Citation omitted.) *State v. Cline*, 11th Dist. Trumbull No. 2007-T-0052, 2008-Ohio-1500, ¶ 60. "'The probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.'" (Citation omitted.) *State v. Kessler Scott*, 11th Dist. Lake No. 2022-L-018, 2022-Ohio-4054, ¶ 46.

{¶62} It has been held that "[f]light is more than merely leaving the scene of the

19

Case No. 2022-T-0107

crime—it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 28. Flight includes "'some escape or affirmative attempt to avoid apprehension'" and "requires the accused to appreciate that he or she has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." (Citations omitted.) *Kessler Scott* at ¶ 45. "The jury may infer that such circumstances demonstrate that the accused is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime." *Id.*

{¶63} James not only left Workman's house after the crime but he left the state of Ohio and was arrested in Mayland about two and a half weeks after the crime occurred. Further, his parole officer indicated he was not permitted to leave the state of Ohio without permission and had not been granted such permission to travel. These circumstances are indicative of making an affirmative attempt to avoid apprehension.

{¶64} James indicates that the record does not demonstrate he was aware that he was being sought in connection with the crimes. However, as noted above, a jury can infer that flight occurred because the defendant knew he was guilty. The jurors, in weighing the facts consistent with the jury instruction provided, could have concluded that the suspect firing seven shots would be aware they caused harm to the victim and, if James was the shooter, must be aware he would be sought by police. It was reasonable for the jury to infer James was aware police were seeking him in connection with the crimes.

{¶65} The authority cited by James is distinguishable from the present matter. In

20

*State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, the court found an abuse of discretion in giving a flight instruction when a defendant left the house after a rape occurred, emphasizing that a defendant must deliberately evade police to be in flight. It found that the defendant did not flee to a place where he could not be located or otherwise attempt to avoid detection. *Id.* at ¶ 64. In the present matter, James went to another state where police had difficulty locating him, while he was prohibited from leaving the state under the terms of his post-release control. In *State v. Italiano*, 7th Dist. Mahoning No. 19 MA 0095, 2021-Ohio-1283, the court found a flight instruction was appropriate where the defendant shot the victim, attempted to hit him with a car, and sped away from the scene. This case does not provide contrary authority to the holding here: where a defendant flees the scene and the state after a shooting, a flight instruction is appropriate.

{¶66} Under these circumstances, we do not find that the court erred in giving the flight/consciousness instruction and, thus, trial counsel was not ineffective by failing to object. *See State v. Olsen*, 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, ¶ 52 ("[d]efense counsel's failure to object was not deficient performance because * * * the trial court correctly instructed the jury").

{¶67} Nonetheless, even if we did determine that the facts did not support a flight instruction, there would be no prejudicial error resulting from trial counsel's failure to object. It has been observed that "'the flight instruction is all but innocuous'" because the "instruction itself informs the jury that, if it finds that some other motive prompted the conduct, or if the jury cannot decide what motivated the conduct, then the jury is not to consider the evidence for any purpose." (Citation omitted.) *State v. Walker*, 2023-Ohio-

21

1949, __ N.E.3d __, ¶ 53 (11th Dist.). It has been held that where a flight instruction should not have been given, it did not result in prejudicial error since the jury was able to "make its own conclusion regarding whether [the defendant] fled from law enforcement and to consider his motivations for doing so" and the instruction allowed, but did not require, the jury to consider evidence of flight in determining guilt. *State v. Sanchez-Sanchez*, 2022-Ohio-4080, 201 N.E.3d 323, ¶ 188 (8th Dist.).

{¶68} The second assignment of error is without merit.

{¶69} In his third assignment of error, James argues that his convictions were against the manifest weight of evidence, asserting that the "evidentiary shortcomings and inconsistencies of the Appellee's case are so numerous that they are practically impossible to list in a comprehensive fashion."

{¶70} "[W]eight of the evidence addresses the evidence's effect of inducing belief." (Citation omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Id.*

22

Case No. 2022-T-0107

{¶71} To convict James of Murder, the State was required to prove, beyond a reasonable doubt, that he did "purposely cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.02(A). For Attempted Murder, it was required to prove he did "engage in conduct that, if successful, would constitute or result in" the foregoing offense. R.C. 2923.02(A). For Having Weapons While Under Disability, it was required to prove that he had, carried, or used a firearm and had previously been convicted of a felony offense of violence. R.C. 2923.13(A)(2). For Escape, it was required to prove that James, knowing he was under supervised release, did "purposely break or attempt to break the supervised release detention * * *." R.C. 2921.34(A)(3).

{¶72} James does not point to a specific conviction unsupported by the weight of the evidence, although his contention appears to be that he did not shoot at Haynes or Workman, which would be applicable to all of the crimes for which he was convicted, with the exception of Escape. James does not present an argument that Escape was unsupported by the weight of the evidence, and it was demonstrated that he left the state of Ohio while on post-release control without permission to do so. *See State v. Young*, 8th Dist. Cuyahoga No. 99552, 2013-Ohio-5247, ¶ 20 (evidence that defendant's whereabouts were unknown supported conviction for Escape under R.C. 2921.34(A)(3)).

{¶73} As to the other offenses, to the extent that James argues that the inconsistencies and evidentiary failings are "so numerous" that they are impossible to list, if this were the case, it is unclear why he provided limited grounds for reversal on this issue: whether Haynes' testimony lacked credibility and the reliance on his testimony for a conviction. We cannot speak to what "numerous" errors in the evidence James alleges exist given his failure to provide argument as to these errors. Nonetheless, we observe

23

that the weight of the evidence presented at trial supports the conclusion that James was the individual who fired shots toward Haynes, killed Workman, he used a firearm to do so, and left the jurisdiction, supporting each of the crimes for which he was convicted. Cell phone records demonstrated James was in the area of Warren where the crime was committed at the time of the shooting. Haynes identified James as the shooter by name and had injuries to his hands that could be consistent with struggling over the firearm. A cell phone belonging to James was recovered from Workman's residence, under the television stand. James left the state of Ohio after the shooting although he was not permitted to do so by the terms of his post-release control. When in custody after his arrest, multiple witnesses indicated that James made statements to Workman's family members that he would kill them, with Jasmine stating he would "get me killed like he did my sister."

{¶74} We find no merit to the argument that the offenses were against the weight of the evidence because Haynes' testimony lacked credibility. James argues that this testimony was "self-serving" and references admissions by Haynes that neighbors "may not have been willing to assist him due to many instances of domestic violence involving he and the victim." James appears to be referencing the suppression hearing, during which Haynes indicated that he had gone to jail once for arguing with Workman and that because Workman was "loud," neighbors may have misperceived they had a domestic dispute. Apart from the fact that this testimony did not reference "many instances of domestic violence," it was also not part of the testimony presented at trial. At trial, the only related testimony before the jury was that Haynes and Workman were a "young, loud couple," not that he had abused her.

24

**{¶75}** There is nothing in the record of the trial to support that Haynes was responsible for Workman's death. His testimony that James committed the crime was consistent with the evidence, including that Haynes immediately sought assistance from neighbors and the police following the incident, that James left the state after the shooting occurred, and that Haynes had several injuries to his hand and knee which could be consistent with a struggle over the gun as described by Haynes. Further, the credibility of Haynes' testimony is an issue to be determined by the trier of fact. "The trier of fact * * * is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." (Citation omitted.) *State v. Lavean*, 11th Dist. Lake No. 2020-L-045, 2021-Ohio-1456, ¶ 37. "Since the jury is in the best position to assess credibility, we generally decline to second guess its credibility determinations." *State v. Tiggett*, 11th Dist. Trumbull No. 2018-T-0036, 2019-Ohio-1715, ¶ 34.

**{¶76}** The third assignment of error is without merit.

**{¶77}** For the foregoing reasons, James' convictions for Murder, Attempted Murder, Having Weapons While Under Disability, and Escape, and the denial of his motion to suppress evidence, are affirmed. Costs to be taxed against appellant.

JOHN J. EKLUND, P.J.,

MARY JANE TRAPP, J.,

concur.